UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**FILED**
JAMES J. WALDRON, CLERK

FEB 1 7 2005

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY _____ DEPUTY

In re:

**BURNS AND ROE ENTERPRISES, INC.**

Debtor.

Chapter 11

Case No. 00-41610 (RG)

## STIPULATED ORDER ESTABLISHING A SEGREGATED, QUALIFIED SETTLEMENT FUND IN CONNECTION WITH SETTLEMENT AND COMPROMISE OF CERTAIN ASBESTOS INSURANCE COVERAGE DISPUTES

### Recitals

A.    On December 4, 2000, Burns and Roe Enterprises, Inc. ("B&R" or "Debtor") commenced a case under chapter 11 of title 11, United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey ("Bankruptcy Court"), entitled *In re Burns and Roe Enterprises, Inc., Debtor*, Case No. 00-41610 (RG).

B.    On December 4, 2000, the Debtor also filed an adversary proceeding in the Bankruptcy Court in connection with the chapter 11 case, entitled *Burns and Roe Enterprises, Inc. v. Continental Casualty Co., et al.*, Adv. Proc. No. 00-3755(RG) ("Adversary Proceeding").

C.    At the time of the entry of the order for relief in the chapter 11 case, the Debtor was named as a defendant in numerous actions alleging personal injury or wrongful death claims

#873827 v3

caused by exposure to asbestos-containing materials for which the Debtor, its predecessors, successors and assigns were alleged to have legal liability.

      D.    An Official Committee of Unsecured Creditors, currently composed only of asbestos personal injury claimants or their representatives ("Committee"), and the Legal Representative of Future Asbestos Personal Injury Claimants ("FCR") were duly appointed in the Debtor's chapter 11 case.

      E.    Hartford Accident and Indemnity Company, Hartford Casualty Insurance Company, Twin City Fire Insurance Company, First State Insurance Company, and New England Insurance Company ("Hartford Parties") issued or allegedly issued certain third-party primary and excess liability insurance policies as well as wrap-up liability policies for specific projects.

      F.    Disputes arose between the Hartford Parties, on the one hand, and the Debtor and certain of its affiliates (collectively, the "Burns and Roe Parties"), the Committee and the FCR, on the other hand, concerning the extent to which certain insurance policies issued by the Hartford Parties may afford additional coverage for asbestos-related claims asserted against the Burns and Roe Parties.

      G.    Subject to approval of the Bankruptcy Court, the Burns and Roe Parties, with the consent of the Committee and the FCR, and the Hartford Parties entered into an agreement to resolve the insurance coverage disputes and controversies ("Hartford Settlement Agreement," a copy of which is annexed as Exhibit A).

#873827 v3

H.    Subject to the satisfaction of terms and conditions relating, among other things, to the timing and amount of settlement payments, the settling parties intend that the proceeds of the settlement to be paid by the Hartford Parties reflect liabilities and obligations of the Burns and Roe Parties for amounts that one or more of them is obligated to pay on account of liability for certain Claims.

I.    The undersigned parties consent to this Order to address the handling of the proceeds of the Hartford Settlement Agreement, and future settlements that may be entered with other insurance carriers and approved by the Bankruptcy Court prior to or absent confirmation of a chapter 11 plan for the Debtor, or in the event of dismissal or conversion of the Debtor's bankruptcy case.

In consideration of the premises, and upon the consent of the undersigned parties, and for good cause shown,

IT IS HEREBY ORDERED AS FOLLOWS:

## I.    Definitions

1.    *General Definitions.*  Unless otherwise defined, capitalized terms have the meanings given in the Hartford Settlement Agreement.

**2.**    *The "Court."*  References to "the Court" shall mean (a) until the closing or dismissal of the Debtor's bankruptcy case, the Bankruptcy Court or, to the extent of a withdrawal of the reference, the United States District Court for the District of New Jersey; and (b) after

#873827 v3

closing or dismissal of the Debtor's bankruptcy case, a court of competent jurisdiction within the State of New Jersey.

## II.    **Establishment of the Qualified Fund**

3.    *Creation of Qualified Fund.* Prior to payment by the Hartford Parties of the first proceeds of the Settlement Payment pursuant to the Hartford Settlement Agreement, the Debtor shall: (a) establish a separate, segregated, interest-bearing account under the name "B&R Asbestos Settlement Fund" at a federally-chartered commercial banking institution within the State of New Jersey; and (b) deposit or cause to be deposited directly into such account, on the date of receipt, the full amount of the payment received, without any deduction. (The segregated fund established under this Order is referred to as the "Qualified Fund".)

4.    *Qualification of the Qualified Fund Under Federal Tax Law.* The Qualified Fund shall be a "qualified settlement fund" under and pursuant to Section 468B of the U.S. Internal Revenue Code, and the regulations promulgated thereunder at Treasury Regulations §§ 1.468B-1, 2. 3 and 4. The establishment of the Qualified Fund by the Debtor meets the "resolve or satisfy" requirement of Treasury Regulations §§ 1.468B-1(c)(2) and (f).

5.    *Future Deposits to the Qualified Fund.* The Debtor, with the prior written consent of the Committee and the FCR, may subsequently deposit or cause to be deposited into the Qualified Fund the proceeds of any additional or further settlements of asbestos insurance coverage disputes between the Debtor and any other insurance carrier(s) that may be approved by the Court (to the extent that judicial approval is required).

#873827 v3

6.      *Qualified Fund to Remain Separate.*  All sums deposited into the Qualified Fund

shall at all times be kept separate and apart from all other funds of the Debtor.  The property and

proceeds of the Qualified Fund (including investment earnings) shall not constitute property of

the Debtor or its bankruptcy estate.  The Qualified Fund shall be a separate entity for all

purposes, including tax purposes.

7.      *Domicile.*  The Qualified Fund shall be deemed domiciled in the State of New

Jersey.

### III.      Joint Co-Administrators of the Qualified Fund

8.      *Co-Administrators.*  The Qualified Fund shall be administered by two co-

administrators (the "Co-Administrators").  Each of the Committee and the FCR shall designate

one individual to serve as a co-administrator of the Qualified Fund, written notice of which shall

be filed with the Court not later than ten (10) days after entry of this Order.  Absent the filing of

a written objection to such designation within ten (10) days after the filing date, such

individual(s) shall be deemed confirmed as the Co-Administrators.

9.      *Liability and Indemnification of Co-Administrators.*  Except for (a) gross

negligence, (b) willful misconduct, or (c) breach or violation of the terms of this Order and any

further orders of this Court which amend, modify or supersede this Order, the Co-Administrators

shall be severally indemnified for any liability, claim, loss or damages of any nature, including

attorneys' fees and costs, incurred or asserted against either of them for actions or omissions

related to administration of the Qualified Fund.  The cost, if any, of such indemnification and

#873827 v3

defense of either or both of the Co-Administrators against any claims shall be deemed to be reasonable expenses of administration of the Qualified Fund. Each Co-Administrator shall be liable only for his own conduct, breaches, omissions and failures, limited by the above, except in the event that one Co-Administrator knows of breaches or violations of the duties and responsibilities or of this Order by the other Co-Administrator and fails promptly to bring them to the attention of the Court or, if the Bankruptcy Trust (as defined in Paragraph I.KK(i) of the Hartford Settlement Agreement) is in existence, to the trustees of the Bankruptcy Trust, then such Co-Administrator may also be responsible and liable for any gross negligence, willful misconduct, breaches or violations of this Order by the other Co-Administrator. The Co-Administrators may cause the Qualified Fund to obtain errors and omissions insurance, the cost of which shall be paid from the proceeds of the Qualified Fund.

10.     *Vacancies and Successors.* Either Co-Administrator may resign by giving thirty (30) days notice to counsel to the other Co-Administrator, counsel to the Debtor, counsel to the Committee, counsel to the FCR, to the United States Trustee (until the closing of the Debtor's bankruptcy case), and to the trustees of the Bankruptcy Trust if it is in existence, by first class mail or by hand delivery. In the event of the resignation or death of either Co-Administrator, or the failure of either Co-Administrator to continue to serve for any other reason, if it is the Committee designee who shall cease to serve, the Committee shall appoint the successor by giving notice thereof to Debtor and the FCR and filing the designation with the Court within ten (10) days thereafter. If it is the FCR designee who shall cease to serve, the FCR shall appoint the successor by giving notice thereof to the Debtor and the Committee and filing the designation with the Court within ten (10) days thereafter. Absent the filing of a written objection to such

#873827 v3

designation within ten (10) days after the filing date, such individual shall be deemed confirmed as the successor Co-Administrator.  In the event of a failure to designate a successor Co-Administrator within twenty (20) days of the occurrence of a vacancy, the surviving Co-Administrator may seek instructions from the Court, including a direction to the appropriate persons to designate a successor Co-Administrator pursuant to this Order.

## IV.    Operation and Management of the Qualified Fund

11.    *General Operation and Management.*  The operation and management of the Qualified Fund shall require the agreement of both Co-Administrators.

12.    *Tax Matters.*  The Co-Administrators shall promptly apply for and obtain a federal tax identification number for the Qualified Fund, which shall be separate from the Debtor's federal tax identification number.  The Co-Administrators shall cause all appropriate state, federal and local tax returns to be filed when due, and to pay from the proceeds of the Qualified Fund any taxes that may be due as reflected thereon.

13.    *Books and Records.*  The Co-Administrators shall maintain the Qualified Fund's books and records separate and apart from those of the Debtor.  Both Co-Administrators shall be entitled to receive copies of all documents and financial records and any pleadings or other documents filed in the Debtor's bankruptcy case relating to the Qualified Fund, and shall be deemed parties in interest for such limited purposes.  All banking and institutional records relating to the assets and investments of the Qualified Fund shall be sent simultaneously to both

#873827 v3

Co-Administrators, and any banks or institutions providing or maintaining such records are

directed to comply with this direction.

14.    *Reports; Review of Trust Expenses* . During the pendency of the Debtor's

bankruptcy case, the Co-Administrators shall file or cause to be filed quarterly reports with the

Bankruptcy Court setting forth the financial status of the Qualified Fund, including an

itemization of the income and expenses of the Qualified Fund.  The Co-Administrators shall

cause copies of each quarterly report to be served on all parties listed on the general service list

for the Debtor's bankruptcy case, and counsel for the Debtor, counsel for the ACC, the FCR, and

counsel for the FCR.  Not later than ten (10) days after the date of service of a quarterly report

with the Bankruptcy Court pursuant to this paragraph, any party in interest in the Debtor's

bankruptcy case may file a written objection solely with respect to the reasonableness of any

expenses listed in the quarterly report (including fees and disbursements of the Co-

Administrators or any professionals whose fees and disbursements are payable from the

Qualified Fund), and shall serve such objection on the Co-Administrators (or their counsel, if the

quarterly report was filed by counsel), any professional paid by the Qualified Fund whose fees or

disbursements are the subject of the objection, and each of counsel for the Debtor, counsel for

the ACC, the FCR, and counsel for the FCR.  Timely-filed objections shall be heard and

determined by the Bankruptcy Court.  The failure of a party in interest to file an objection to a

quarterly report within the time period prescribed by this paragraph shall operate to bar any

further objection by that party in interest to such report.  Nothing contained herein shall limit the

power of this Court  to raise and address *sua sponte* issues related to any quarterly report. If no

objections are timely filed with respect to a quarterly report, such report shall be deemed final

and shall not be subject to further review or objection.

15.     *Investment of Funds.*  The Co-Administrators shall invest and reinvest funds

maintained in the Qualified Fund (including investment earnings) in accordance with the

Investment Guidelines appended hereto as Exhibit B.  The bank, institution or entity with which

such funds are deposited or invested shall provide a bond or deposit of securities as specified in

11 U.S.C. §§ 345(b)(1) - (2).  No disbursements shall be made from the Qualified Fund without

further Order of the Court, except for investing and reinvesting such funds, and paying from such

funds the following:  reasonable expenses of administering the Qualified Fund as required

hereby including, but not limited to, fees and costs of the Co-Administrators and professionals

retained by the Qualified Fund or its Co-Administrators; taxes; and disbursements of proceeds of

the Qualified Fund otherwise permitted by this Order.

16.     *Resolution of Disputes.*  In the event of any disagreement, dispute or inability to

determine the proper or necessary actions of the Qualified Fund, the Co-Administrators shall be

authorized to seek instructions and/or authorization or approval from the Court.  Whenever a Co-

Administrator requires counsel, each Co-Administrator shall be entitled to retain separate

counsel, the reasonable fees and costs of which shall be paid by the Qualified Fund.  The

Committee and the FCR shall be parties in interest in proceedings relating to the resolution of

any such disputes.

17.     *The Committee's and the FCR's Responsibilities and Professionals.*  The

Committee and the FCR may retain professionals to assist them in performing any duties or

#873827 v3

responsibilities conferred on them by this Order, and the reasonable professional fees and costs

of the Committee, the FCR and their professionals shall be paid by the Qualified Fund. Fees and

expenses relating to the performance of duties and responsibilities of the Committee, the FCR

and their professionals undertaken or discharged in the Debtor's chapter 11 case shall be subject

to the provisions for allowance and payment of such fees and costs from the Debtor's estate

pursuant to the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, local rules and

applicable administrative orders. If the Debtor's bankruptcy case is dismissed or converted to a

chapter 7 liquidation case prior to establishment of the Bankruptcy Trust, the Committee and the

FCR thereafter may perform the duties and responsibilities conferred upon them by this Order in

the capacity of advisors to the Co-Administrators concerning the operation and administration of

the Qualified Fund, and shall be entitled to compensation for fees and reimbursement of

expenses from the Qualified Fund in accordance with the terms of this Order.

## V.      Limitations on Use of Proceeds of, and Disbursements from, the Qualified Fund

18.      *Payment Only of Claims, and Expenses and Costs of the Qualified Fund.* The

sums in, and the proceeds of, the Qualified Fund (including any investment earnings) shall be

used solely for payments: (a) of fees and costs of the Qualified Fund as permitted by this Order;

and (b) for the benefit of holders of Claims as provided in: (1) any claims resolution and

distribution procedures (for the purpose of resolving and paying such Claims) that are either (i)

promulgated pursuant to a confirmed and substantially consummated chapter 11 plan in the

Debtor's bankruptcy case, or (ii) promulgated by the Co-Administrators with the prior written

consent of the Committee and the FCR and with the approval of the Court in the event that the

#873827 v3

Debtor's bankruptcy case is dismissed or converted to a chapter 7 liquidation case prior to

confirmation and substantial consummation of a chapter 11 plan; or (2) such other agreement as

may be entered into by or with the prior written consent of the Committee and the FCR, and with

the approval of the Court.  Claims under this paragraph shall be "qualified claims" within the

meaning of Treasury Regulations § 1.468B-1(c)(2) and for the purposes of this Order ("Qualified

Claims").

19.     *Pour-Over Provision for Consummation of a Chapter 11 Plan.*  Upon

confirmation and consummation of a chapter 11 plan in the Debtor's bankruptcy case that

provides for the creation of one or more comprehensive funds, trusts, or accounts for the benefit

of claimants holding or asserting asbestos-related personal injury and/or wrongful death claims

and demands (as such term is defined in Section 524(g) of the Bankruptcy Code) against the

Debtor, then all sums then on deposit in the Qualified Fund, including all investment earnings,

shall promptly be transferred to and "poured over" to such fund, trust or account, *provided that*

all sums so transferred shall be used solely for payment of Qualified Claims and for other proper

purposes of such fund, trust or account in accordance with the purposes permitted by Section

468B of the Internal Revenue Code and other applicable law and rules.  The Qualified Fund shall

be deemed terminated upon the transfer to and pouring over of its proceeds pursuant to this

paragraph.  If such a transfer or pour over occurs, the fund, trust or account into which the

proceeds are transferred or poured over shall thereafter administer and disburse such funds in

accordance with its governing instruments.

#873827 v3

20.    *Distributions.*  The Court may enter an Order or Orders directing distribution in accordance herewith of sums in the Qualified Fund:  (a) in connection with confirmation and consummation of a chapter 11 plan as provided above; (b) if the Debtor's bankruptcy case is dismissed or converted to a chapter 7 liquidation case; or (c) as otherwise provided in this Order, in each case at such time and in such manner as the Court shall deem it appropriate to authorize such distribution(s).  In the event the Court shall hear or consider distribution of the Qualified Fund in circumstances other than confirmation and consummation of a chapter 11 plan, the Court may consider proposals for distribution submitted by the Co-Administrators with the prior written consent of the Committee and the FCR.

21.    *No Reversion to Debtor or Settling Insurers.*  In no event shall any of the sums in the Qualified Fund be:  (i) refunded to or revert to the Debtor or any subsidiary or affiliate of the Debtor or any insurance carrier without the prior written consent of the Committee and the FCR; or (ii) used for distributions to any creditors of the Debtor other than those asserting and holding Qualified Claims.

## VI.    <u>Miscellaneous Provisions</u>

22.    *Jurisdiction.*  The Bankruptcy Court shall retain jurisdiction over the Qualified Fund, for the benefit of persons holding asbestos-related personal injury claims and demands against the Debtor, until the earlier of (a) the dismissal or closing of the Debtor's bankruptcy case; (b) the transfer or "pouring over" of the Qualified Fund to a trust, fund or account pursuant to a confirmed chapter 11 plan as elsewhere provided in this Order (subject to the continuing jurisdiction of the Bankruptcy Court, if any, over such trust, fund or account); or (c) such time as

#873827 v3

all funds in the Qualified Fund have been disbursed in accordance with this Order or any further

order of the Bankruptcy Court, or the Bankruptcy Court declines or fails to take jurisdiction. In

the event the Bankruptcy Court for any reason declines or fails to take jurisdiction of any matter

pertaining or relating to the Qualified Fund as set forth in this Order, then any party in interest

may seek relief in a court of competent subject matter jurisdiction within the State of New

Jersey.

   23.   *No Prejudice to Potential Beneficiaries of the Qualified Fund.* The establishment

and administration of the Qualified Fund does not and shall not at this time operate to bar,

channel or restrict any claims that may be entitled to receive payment from the Qualified Fund.

   24.   *Continuation of Certain Responsibilities of the Committee and the FCR Upon

Dismissal or Conversion of the Debtor's Bankruptcy case.* Notwithstanding that in certain

circumstances the Committee or the FCR may be discharged or cease to exist in the context of

the Debtor's bankruptcy case, each of the Committee and the FCR shall continue to exist and to

serve for purposes of the implementation and performance of this Order, and each shall have the

respective power and authority set forth herein. Subject to Court approval, and provided that it

does not impair the qualification of the Qualified Fund under Section 468 B of the Internal

Revenue Code, the proceeds in the Qualified Fund may be used to pay the reasonable fees and

costs of the Committee and the FCR, including their respective retained professionals, in

connection with their respective activities authorized hereunder.

25.    *Binding Effect.* This Order and all of its provisions shall be binding upon any
successor Co-Administrators and upon any chapter 11 or chapter 7 trustee who may hereafter be
appointed in the Debtor's bankruptcy case or in any succeeding case, action or proceeding.

26.    *Further Orders.* This Order shall be subject to such additional and further orders
as may be necessary to implement or effectuate its terms.

27.    *Duration of the Qualified Fund.* Unless the proceeds of the Qualified Fund are
fully distributed as otherwise provided in this Order, and to the extent that any rule against
perpetuities shall be deemed applicable to the Qualified Fund, the Qualified Fund will exist until
twenty-one (21) years less ninety-one (91) days pass after the death of the last survivor of all of
the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy,
living on the date hereof. Any funds remaining in the Qualified Fund at such time shall be
contributed by the Co-Administrators to a charitable organization exempt from federal income
tax under Section 501(c)(3) of the Internal Revenue Code, whose purposes shall be related to the
treatment of, research on or the relief of individuals suffering from asbestos related or similar
respiratory disorders.

28.    *Governing Law.* This Order shall be governed by, and construed under, the
internal laws of the State of New Jersey without regard to its principles of conflicts of laws,
except to the extent that the federal bankruptcy and tax laws of the United States of America
govern its operation and construction, in which case such federal laws shall govern.

#873827 v3

29.   *Final Accounting.*  The Co-Administrators shall file a final accounting with the

Court upon or promptly after the termination or pouring over of the Qualified Fund. The

Qualified Fund (or, in the event of pouring over pursuant to Paragraph 19 above, the trust, fund

or account into which the funds are poured over) shall bear the reasonable fees and expenses of

the Co-Administrators for the preparation and filing of the final accounting.

Dated as of February 17, 2005.

_____
ROSEMARY GAMBARDELLA
Chief United States Bankruptcy Judge

**AGREED AND STIPULATED:**

BURNS & ROE ENTERPRISES INC.,
Debtor and Debtor-in-Possession

By:   SILLS CUMMIS EPSTEIN & GROSS, P.C., its counsel
One Riverfront Place
Newark, New Jersey 07102

By: _____
Jack M. Zackin (JZ-2540)
A Member of the Firm

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF BURNS & ROE ENTERPRISES INC.,

Gilbut Heintz + Randolph LLP
By:   CAPLIN & DRYSDALE, CHARTERED, its counsel
One Thomas Circle, N.W.
Washington, D.C. 20005

By: _____
Peter Van N. Lockwood — Jonathan Cohen
A Member of the Firm

#873827 v3

ANTHONY R. CALASCIBETTA, as Legal Representative
of Future Asbestos Claimants

By:     PRYOR CASHMAN SHERMAN & FLYNN LLP, his counsel
        410 Park Avenue
        New York, New York 10022

        By: _____
            Richard Levy, Jr.
            A Member of the Firm

## EXHIBIT A

to the

## STIPULATED ORDER

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is made and entered

into as of the Execution Date by and between the Burns and Roe Parties and the

Hartford Parties.

## RECITALS

WHEREAS, the Hartford Parties issued or allegedly issued certain

third-party primary and excess liability insurance policies as well as wrap-up

liability policies for specific projects where the Burns and Roe Parties allegedly were

involved in asbestos-related activities; and

WHEREAS, since at least 1984, one or more of the Burns and Roe

Parties have been named as defendants in numerous asbestos-related Claims; and

WHEREAS, Hartford Accident and Indemnity Company asserts that it

has defended and/or indemnified one or more of the Burns and Roe Parties against

certain Asbestos Released Claims under primary general liability policies; and

WHEREAS, on December 4, 2000, Burns and Roe filed a voluntary

petition under chapter 11 of the United States Bankruptcy Code in the United

States District Court for the District of New Jersey, In re Burns and Roe

Enterprises, Inc., Case No. 00-41610(RG); and

WHEREAS, on December 4, 2000, Burns and Roe also filed an

adversary proceeding in the Chapter 11 Case, Burns and Roe Enterprises, Inc. v.

Continental Casualty Co., et al., Case No. 00-3755(RG) (the "Adversary

Proceeding"); and

WHEREAS, the Parties disagree with respect to whether and to what

extent certain insurance policies may afford additional coverage for Trust Claims

(the "Coverage Disputes"); and

WHEREAS, the Hartford Parties have raised certain objections in the

Bankruptcy Case to the proposed disclosure statement and proposed amended plan

of reorganization and other matters; and

WHEREAS, the Parties, subject to the terms and conditions of this

Agreement, now wish fully and finally to compromise and resolve the Coverage

Disputes and other disputes between or among them, including those arising in the

Bankruptcy Case; and

WHEREAS, as part of the compromise and resolution of the Coverage

Disputes, the Hartford Parties wish to repurchase the Burns and Roe Parties'

Interests in the Subject Insurance Policies;


NOW, THEREFORE, in consideration of the mutual covenants

contained herein and intending to be legally bound hereby, the Parties hereby agree

as follows:

2

I.   DEFINITIONS

As used in this Agreement, the following terms shall have the meanings set forth below.  Terms not defined below have the meaning given to them in the Bankruptcy Code.  Terms used in the singular shall be deemed to include the plural, and terms used in the plural shall be deemed to include the singular.  The word "including" means "including but not limited to."

A.   "2004 Policies" means insurance policy numbers 13ECSOA4709 and 13UENTG2680 issued by Hartford Fire Insurance Company for the policy period May 1, 2004 to May 1, 2005, and renewals thereof, if any.

B.   "Approval Date" means the day on which the Approval Order has been entered and has become a Final Order.

C.   "Approval Order" means an order, in substantially the form attached hereto as Exhibit 1, entered by the Bankruptcy Court that (i) approves this Agreement, (ii) authorizes the Parties to undertake the settlement and the sale of the Burns and Roe Parties' Interests in the Subject Insurance Policies, and (iii) provides for the Injunction.

D.   "Asbestos Insurance Coverage Claim" means any Claim for insurance coverage and/or other benefits in connection with any Asbestos Released Claim.

E.   "Asbestos Plaintiff" means any and all Persons with Asbestos Released Claims.

F.    **"Asbestos Released Claims"** means any and all Claims arising

out of and/or attributable to, in any manner or fashion, asbestos and/or asbestos-

containing products, including Claims alleging personal injury, property damage,

loss of use, financial loss, loss of consortium, bodily injury, mental injury, mental

anguish, shock, sickness, disease, disability, or death or the fear or apprehension

thereof, or seeking compensation for the cost of medical monitoring or screening, or

seeking relief of any kind for any other injury or condition of any kind or sort

whatsoever, arising out of, caused by or attributable to, in whole or in part, directly

or indirectly, the manufacture, sale, handling, distribution, installation, repair,

design, specification of the use of, removal or use of asbestos or asbestos-containing

products or material, or any conduct, act or omission that results or is alleged to

result in the exposure to asbestos or asbestos-containing material (alone or in

combination with any other dust, mineral, fiber, substance or material), including

Claims arising out of actual, threatened or alleged exposure to asbestos (alone or in

combination with any other dust, mineral, fiber, substance or material), Claims

seeking the removal, repair, abatement or replacement of asbestos or asbestos-

containing material, Claims alleging injury as a result of exposure to asbestos at

premises owned, rented, occupied or controlled by any Burns and Roe Parties, and

Claims based on or arising out of any theory of liability or basis of recovery based

upon, growing out of or attributable to asbestos. "Asbestos Released Claims"

includes Claims that fall within or outside the scope of the definitions of "products

**4**

liability," "products hazard," and/or "completed operations hazard," or their

equivalents, contained in the Subject Insurance Policies and Excepted Policies.

G.    **"Bankruptcy Case"** means the bankruptcy case, filed

December 4, 2000, by Burns and Roe in the United States District Court for the

District of New Jersey, Case No. 00-41610(RG).

H.    **"Bankruptcy Code"** means Title 11 of the United States Code,

11 U.S.C. §§ 101 *et seq.*, as amended from time to time.

I.    **"Bankruptcy Court"** means the United States Bankruptcy

Court for the District of New Jersey and, to the extent it exercises jurisdiction over

the Bankruptcy Case, the United States District Court for the District of New

Jersey.

J.    **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy

Procedure.

K.    **"Burns and Roe"** means Burns and Roe Enterprises, Inc., both

individually and as debtor-in-possession in the Bankruptcy Case.

L.    **"Burns and Roe Parties"** means (i) Burns and Roe; Winona

Hudson Corporation; Burns and Roe Group, Inc.; Burns and Roe Construction

Group, Inc.; Burns and Roe Services Corp., and (ii) each other Person over which, as

of the Execution Date, the Persons listed in (i) above have the legal right, by way of

contract, express corporate authority, or direct or indirect majority ownership, to act

on behalf of or to bind and which are Insureds under a Subject Insurance Policy or

Excepted Policy, including each of the respective directors, members, officers, shareholders, agents and employees of the Persons listed in (i) above, solely in their capacities as such, and those Persons listed on Exhibit 2.

M.   **"Burns and Roe Releasees"** means (i) each of the Burns and Roe Parties; (ii) each of their respective parents, subsidiaries, divisions, holding companies, merged companies, acquired companies, predecessors-in-interest, successors-in-interest and assigns, solely in their capacities as such; and (iii) the directors, members, officers, shareholders, agents and employees of the foregoing, solely in their capacities as such.

N.   **"Claim"** means any past, present, or future claim, demand, action, cause of action, suit or liability of any kind or nature whatsoever, whether at law or in equity, known or unknown, asserted or unasserted, anticipated or unanticipated, accrued or unaccrued, fixed or contingent, which has been or may be asserted by or on behalf of any Person, whether seeking damages (including compensatory, punitive or exemplary damages) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party claims, suits, lawsuits, administrative proceedings, notices of liability or potential liability (including Potentially Responsible Party or "PRP" notices), arbitrations, actions, rights, requests, causes of action or orders. "Claim" also includes "claim" as defined in Bankruptcy Code Section 101(5), and "demand" as defined in Bankruptcy Code Section 524(g)(5).

6

O.    **"Committee"** means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case.

P.    **"Direct Action Claim"** means any Claim by an Asbestos Plaintiff against any Hartford Released Party that arises from the activities of the Burns and Roe Parties or their Interests in any Subject Insurance Policy, and any Asbestos Released Claim by any Asbestos Plaintiff against any Hartford Released Party, whether arising by contract, in tort or under the laws of any jurisdiction, including any statute that gives a third party a direct cause of action against an insurer.

Q.    **"Excepted Insureds"** means any Insured under the Subject Insurance Policies that is not also a Burns and Roe Party.

R.    **"Excepted Policies"** means the insurance policies listed on Exhibit 3 hereto.

S.    **"Execution Date"** means the date on which the last of the following occurs:  (i) both the Burns and Roe Parties and the Hartford Parties have executed this Agreement; and (ii) both the Committee and the Futures Representative have consented to this Agreement pursuant to Paragraph 20.1 of this Agreement.

T.    **"Extra-Contractual Claim"** means any Claim against a Hartford Released Party seeking any type of relief, including compensatory, exemplary or punitive damages, on account of alleged bad faith; failure to act in

7

good faith; violation of any duty of good faith and fair dealing; violation of any

unfair claims practices act or similar statute, regulation or code; or any other

similar type of alleged misconduct or omission. "Extra-Contractual Claim" does not

mean Claims for insurance coverage and/or benefits under any insurance policy.

U.    **"Final Order"** means an order or judgment (including any

modification or amendment thereof) that remains in effect and has not been

reversed, vacated or stayed, and as to which the time to appeal or seek review,

rehearing or writ of certiorari has expired and as to which no appeal or petition for

review, reconsideration, rehearing or certiorari has been taken or, if taken, remains

pending.

V.    **"Futures Representative"** means Anthony R. Calascibetta,

the official Legal Representative of Future Asbestos Personal Injury Claimants

appointed by order of the Bankruptcy Court dated March 19, 2002, and any

successor to him.

W.    **"Hartford Parties"** means Hartford Accident and Indemnity

Company, Hartford Casualty Insurance Company, Twin City Fire Insurance

Company, First State Insurance Company, Hartford Fire Insurance Company, New

York Underwriters Insurance Company, Hartford Underwriters Insurance

Company and New England Insurance Company.

X.    **"Hartford Released Parties"** means (i) each of the Hartford

Parties and (ii) each of their respective parents, subsidiaries, divisions, holding

companies, merged companies, acquired companies, predecessors-in-interest,

8

successors-in-interest and assigns, including The Hartford Financial Services

Group, Inc., solely in their capacities as such; and (iii) the directors, officers,

shareholders, agents and employees of the foregoing, solely in their capacities as

such.

Y.    **"Injunction"** means the "Injunction" contained in Paragraph 9

of the approval order attached hereto as Exhibit 1.

Z.    **"Insurance Coverage Claim"** means any Claim for insurance

coverage and/or other benefits under the Subject Insurance Policies.

AA.    **"Insured"** means any Person entitled to insurance coverage

and/or other benefits under the Subject Insurance Policies or Excepted Policies,

including "insureds," "named insureds" or "additional insureds" as those terms are

defined or used in the Subject Insurance Policies and Excepted Policies; provided,

however, that Insured does not include any Person asserting a Direct Action Claim.

BB.    **"Interests"** means all liens, Claims, encumbrances, interests

and other rights of any nature, whether at law or in equity.

CC.    **"Parties"** means the Burns and Roe Parties and the Hartford

Parties.

DD.    **"Person"** means an individual, a corporation, a partnership, a

joint venture, an association, a joint stock company, a limited liability company, a

limited liability partnership, an estate, an unincorporated organization, a trust, a

class or group of individuals, or any other entity or organization, including any

**9**

federal, state or local governmental or quasi-governmental body or political

subdivision, department, agency or instrumentality thereof.

EE.    **"Plan"** means any plan of reorganization confirmed by the

Bankruptcy Court in the Bankruptcy Case.

FF.    **"Section 524(g) Injunction"** means an injunction issued

pursuant to 11 U.S.C. § 524(g) in connection with confirmation of a Plan.

GG.    **"Settlement Amount"** means the sum of sixty-five million

dollars ($65,000,000).

HH.    **"Settling Insurance Entity"** means "Settling Insurance

Entity," as that term is defined in the Debtor's Amended Plan of Reorganization,

dated December 15, 2003, or the equivalent term in any Plan.

II.    **"Stipulated Order"** means the stipulated order establishing a

qualified settlement fund to facilitate the transactions contemplated by this

Agreement, attached as Exhibit 4.

JJ.    **"Subject Insurance Policies"** means all of the following

insurance policies:

> 1)    any insurance policy listed on the schedule attached as
> Exhibit 5 hereto; and
>
> 2)    any liability insurance policy (including any general
> liability policy, wrap-up policy, site-specific policy or project-
> specific policy; whether such policy is primary, umbrella, excess,
> or otherwise, whether known or unknown, whether domestic or
> foreign, and regardless of the policy territory covered) that was
> issued by a Hartford Party to a Burns and Roe Party or that
> provides insurance coverage and/or other benefits to a Burns
> and Roe Party for a policy period that commences prior to May
> 1, 1987, and that provides insurance coverage and/or other
> benefits in connection with any Trust Claim or any Asbestos
> Released Claim; and

3)     any liability insurance policy (including any general liability policy, wrap-up policy, site-specific policy or project-specific policy; whether such policy is primary, umbrella, excess, or otherwise, whether known or unknown, whether domestic or foreign, and regardless of the policy territory covered) that was issued by a Hartford Party to a Burns and Roe Party or that provides insurance coverage and/or other benefits to a Burns and Roe Party for a policy period that commences on or after May 1, 1987, and provides insurance coverage and/or other benefits in connection with any Trust Claim or any Asbestos Released Claim and that does not contain an exclusion or exclusionary language that applies to exclude all Trust Claims and Asbestos Released Claims, it being expressly understood that the insurance policies listed in Exhibit 5 hereto are Subject Insurance Policies, regardless of whether they contain an exclusion or exclusionary language that applies to exclude all Trust Claims and Asbestos Released Claims.

Notwithstanding the foregoing, Subject Insurance Policies does not mean (i) the 2004 Policies, (ii) the Excepted Policies, (iii) any insurance policy issued on or after May 1, 2004, (iv) Workers' Compensation Insurance, or (v) automobile liability policies.

KK.    "Trust" means (i) if the Approval Date occurs after the effective date of the Plan, a trust established pursuant to the Plan (the "Bankruptcy Trust"), or, (ii) if the Approval Date occurs prior to the effective date of the Plan or in the event that no such trust is established pursuant to the Plan, the fund established pursuant to the Stipulated Order for the purpose of holding the Settlement Amount pending resolution of the Debtors' Bankruptcy Case (the "QSF"), which QSF is intended to qualify as a "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code of 1986, as amended, and Treasury Regulations Section 1.468B-1.  The Parties covenant and agree to take all actions and to prepare all

11

elections and forms necessary to effect such treatment, including the Stipulated

Order.

LL.   **"Trust Claim"** means "Trust Claim" as that term is defined in

the proposed Plan of Reorganization, dated December 15, 2003, filed in the

Bankruptcy Case, or the Plan, whichever is broader.

MM.  **"Workers' Compensation Insurance"** means that portion of

any insurance policy that provides insurance coverage for Claims made by present

or former employees of any Burns and Roe Party under a government-mandated

workers' compensation system. Workers' Compensation Insurance expressly does

not mean portions of any insurance policy entitled "Employer's Liability Insurance"

or otherwise providing liability insurance coverage for employee claims outside a

government-mandated workers' compensation system.

II.   <u>PAYMENT OF SETTLEMENT AMOUNT</u>

2.1   If the Approval Date occurs on or before January 21, 2005, the

Hartford Parties shall pay the Settlement Amount to the Trust on the following

schedule:

(i) on or before the earlier of (A) January 21, 2005, or (B) thirty (30)

calendar days after receipt of written notice from any Burns and Roe Party, the

Committee, the Futures Representative or the Trust that the Approval Date has

occurred and the Plan has been confirmed by the Bankruptcy Court and has

become effective, and provided that those events have actually occurred, the

Hartford Parties shall pay forty-five million U.S. dollars ($45,000,000); and

(ii) on January 21, 2005, the Hartford Parties shall pay an additional twenty million dollars ($20,000,000).

2.2     If the Approval Date has not occurred by January 21, 2005, the Hartford Parties shall pay the Settlement Amount to the Trust within ten (10) days after notice to the Hartford Parties by any Burns and Roe Party, the Committee, the Futures Representative, or the Trust that the Approval Date has occurred, and provided that the Approval Date has occurred.

2.3     No part of the Settlement Amount shall be subject to any reimbursement to any Hartford Released Party by the Burns and Roe Releasees or the Trust at any time, including through retrospective premiums, deductibles, or self-insured retentions.

2.4     If and when the Plan is confirmed by the Bankruptcy Court and becomes effective, and if the Settlement Amount already has been transferred to the QSF, the Co-Administrators of the QSF immediately shall transfer the Settlement Amount to the Bankruptcy Trust, as directed by the Stipulated Order.

2.5     The Parties agree that, subject to the terms and conditions of this Agreement and the entry of the Approval Order, the Settlement Amount is the total amount the Hartford Released Parties are obligated to pay to the Burns and Roe Parties or the Trust on account of any and all Claims of any kind alleged to be covered by the Subject Insurance Policies, including Asbestos Released Claims, Trust Claims, Extra-Contractual Claims and Direct Action Claims, or on account of any and all Asbestos Released Claims, Trust Claims and Direct Action Claims

13

alleged to be covered under the Excepted Policies or any other third-party liability

policy that was issued by a Hartford Party to a Burns and Roe Party or that

provides insurance coverage and/or other benefits (excluding Workers'

Compensation Insurance) to a Burns and Roe Party for a policy period commencing

before May 1, 2004; that under no circumstance will any Burns and Roe Party seek

to obligate any of the Hartford Released Parties to make any additional payments to

anyone in connection with the Subject Insurance Policies, including amounts

allegedly owed to any of the Burns and Roe Parties for pre-petition settlements or

any Extra-Contractual Claims; and that the Parties shall treat all limits of liability

of the Subject Insurance Policies, including all per occurrence and aggregate limits,

as fully and properly exhausted.  The Parties further agree that the Settlement

Amount is the full purchase price of the Burns and Roe Parties' Interests in the

Subject Insurance Policies, and that, upon payment of the Settlement Amount, the

Burns and Roe Parties shall be deemed to have sold to the Hartford Parties, and

shall deem the Hartford Parties to own, the Burns and Roe Parties' Interests in the

Subject Insurance Policies free and clear of all Interests of any Person.  The

Hartford Released Parties shall have no further obligation to the Burns and Roe

Parties under the Subject Insurance Policies for any Claims, including Asbestos

Released Claims, Trust Claims, Direct Action Claims or Extra-Contractual Claims.

The Hartford Released Parties shall have no further obligation to the Burns and

Roe Parties under the Excepted Policies for Asbestos Released Claims, Trust Claims

or Extra-Contractual Claims based on acts or omissions prior to the Execution Date.

14

Notwithstanding the foregoing, the Burns and Roe Parties do not purport to sell, and the Hartford Parties shall not own, any Interest of an Excepted Insured in a Subject Insurance Policy.

2.6    The Parties expressly agree that the Hartford Parties are not acting as volunteers in paying the Settlement Amount and that the Hartford Parties' payment of the Settlement Amount reflects liabilities and obligations to the Burns and Roe Parties for amounts one or more of them is obligated to pay on account of certain Claims.

2.7    The Hartford Parties shall not seek reimbursement from any Person for any payments the Hartford Parties are obligated to make under this Agreement, whether by way of a claim for contribution, subrogation, indemnification, retrospective premiums, deductibles, or self-insured retentions, other than from the Hartford Parties' reinsurers in their capacity as reinsurers of the Hartford Parties. Notwithstanding the foregoing, if a third party pursues a contribution, subrogation or indemnification claim against a Hartford Released Party relating to or arising out of any of the Claims released pursuant to Paragraph 4.1(a), then the Hartford Parties shall be free to assert all claims and defenses, including a contribution, subrogation or indemnification claim against such third party. To the extent the Hartford Parties recover any amount from such third party, the proceeds of such recovery shall be paid by the Hartford Parties promptly to the Trust, after reimbursement of the Hartford Parties from such proceeds for their attorneys' fees, costs and expenses incurred in prosecuting and defending such

15

claim. The Burns and Roe Parties shall use their reasonable best efforts to obtain

agreements similar to those contained in this Paragraph 2.7 from all insurers with

which they settle with respect to Claims released pursuant to Paragraph 4.1(a).

2.8    In the event that any insurer of one or more of the Burns and

Roe Parties obtains a judicial determination or binding arbitration award that it is

entitled to obtain a sum certain from a Hartford Released Party as a result of a

Claim for contribution, subrogation, indemnification or other similar claim against

a Hartford Released Party for the Hartford Released Party's alleged share or

equitable share, or to enforce subrogation rights, if any, of the defense and/or

indemnity of any Burns and Roe Party for any Claims released pursuant to this

Agreement, such Burns and Roe Party shall voluntarily reduce its judgment or

Claim against, or settlement with, such other insurer(s) to the extent necessary to

eliminate such contribution, subrogation or indemnification Claims against the

Hartford Released Party.  To ensure that such a reduction is accomplished, the

Hartford Released Party shall be entitled to assert this Paragraph as a defense to

any action against it for any such portion of the judgment or Claim and shall be

entitled to have the court or appropriate tribunal issue such orders as are necessary

to effectuate the reduction to protect the Hartford Released Party from any liability

for the judgment or Claim.

III.    BANKRUPTCY-RELATED OBLIGATIONS

3.1    No later than ten (10) business days after the Execution Date,

Burns and Roe shall file a motion seeking entry of the Approval Order, and the

Parties shall use their reasonable best efforts promptly to obtain entry of the Approval Order as a Final Order.

      3.2    The Hartford Parties' payment of the Settlement Amount is not conditioned upon entry of a Section 524(g) Injunction.  Nevertheless, if any Plan provides for injunctive protection to be afforded to Settling Insurance Entities, the Burns and Roe Parties shall designate the Hartford Released Parties as Settling Insurance Entities entitled to the benefit of any and all such injunctions, including any injunction pursuant to Section 524(g) or Section 105 of the Bankruptcy Code.

      3.3    Subsequent to the Execution Date, and provided the Agreement does not become null and void pursuant to Paragraph 3.7, the Hartford Released Parties and The Hartford Financial Services Group, Inc. (i) shall not file or pursue any Claims in the Bankruptcy Case or the Adversary Proceeding; (ii) shall not object to or oppose confirmation of the Plan or approval of any disclosure statement and shall not appeal any order confirming the Plan in the Bankruptcy Case or Adversary Proceeding; (iii) shall not serve or pursue any discovery requests in the Bankruptcy Case or Adversary Proceeding; (iv) shall not vote on the Plan; and (v) shall not otherwise participate in the Bankruptcy Case or the Adversary Proceeding other than in support of the Approval Order and the injunctive relief contained therein.  Within three (3) business days of the filing of the Motion for the Approval Order, the Hartford Parties shall dismiss or withdraw without prejudice any Claims, objections, motions, briefs or pleadings already filed in the Bankruptcy Court, including the Hartford Parties' claim for retrospective premiums.  Upon the entry of the Approval Order as a Final Order, the Hartford Parties shall take all

necessary steps to withdraw with prejudice all Claims, objections, motions, briefs or
pleadings already filed in the Bankruptcy Court.

3.4    The Burns and Roe Parties shall not include any provision in
any Plan that materially and adversely affects the rights and obligations of the
Hartford Released Parties under this Agreement.  Neither the Burns and Roe
Parties nor the Hartford Released Parties, subsequent to the Execution Date and
provided the Agreement does not become null and void pursuant to Paragraph 3.7,
shall make any Claims against or seek discovery from one another in the
Bankruptcy Case or the Adversary Proceeding.  The Hartford Released Parties shall
cooperate with the Burns and Roe Parties by complying with reasonable requests
from the Burns and Roe Parties for claims payment information under the Subject
Insurance Policies and, to the extent such information is not protected by any
applicable privilege or otherwise protected from discovery, for documents and other
information in connection with Claims of the Burns and Roe Parties under or in
connection with the Subject Insurance Policies, including billing records for Claims
of the Burns and Roe Parties.

3.5    When the Plan becomes effective, if ever, the rights and
obligations of the Burns and Roe Parties under this Agreement shall be deemed to
have been assigned to the Trust without need of further action by any Party or
Person, and the Trust shall be bound by all of the provisions of this Agreement.  The
Burns and Roe Parties shall continue to be bound by this Agreement and shall
retain the obligations and benefits hereunder.  Notwithstanding the foregoing, after
a Plan is confirmed by the Bankruptcy Court, the Burns and Roe Parties shall have

18

no obligations hereunder for any obligations of the Trust over which the Burns and

Roe Parties have no control and the Trust shall have no obligations hereunder for

any obligations of the Burns and Roe Parties over which the Trust has no control.

3.6    Consummation of the transactions contemplated by this

Agreement is expressly conditioned upon entry of the Approval Order as a Final

Order.

3.7    Upon the occurrence of any final judicial disapproval of this

Agreement, including that the Bankruptcy Court refuses to enter the Approval

Order, or if on appeal the Approval Order is vacated, reversed or modified in a

manner that materially and adversely affects the Hartford Parties' interests under

this Agreement, this Agreement shall thereafter be null and void.

3.8    If this Agreement becomes null and void pursuant to Paragraph

3.7 herein, then: (1) the Agreement, except for Sections I, VII, VIII, XI through

XIV, XVII through XX, and Paragraphs 3.7, 3.8 and 6.1(a-d, f) (which shall remain

in full force and effect), shall be vitiated and shall be a nullity; (2) the Hartford

Parties shall have no obligation to pay the Settlement Amount pursuant to this

Agreement; (3) the Burns and Roe Parties shall not be obligated by this Agreement

to designate the Hartford Released Parties as Settling Insurance Entities, and the

Hartford Released Parties shall not be entitled under this Agreement to assert as a

defense to any claim any benefit of any injunction whether under the Plan or

contained within the Approval Order; (4) the Parties shall have all of the rights,

defenses, and obligations under or with respect to any and all insurance policies

(including the Subject Insurance Policies and the Excepted Policies) that they would

19

have had absent this Agreement, including any right to object or otherwise

participate in the Bankruptcy Case; and (5) any and all otherwise applicable

statutes of limitations or repose, or other time-related limitations, shall be deemed

to have been tolled for the period from the Execution Date through the date that the

Agreement becomes null and void, and no party shall assert or rely on any time-

related defense to any Claim by any Party related to such period.

IV.    TERMINATION OF POLICY RIGHTS AND RELEASES

   4.1 Effective immediately upon the payment by the Hartford Parties

of the first installment of the Settlement Amount pursuant to Section II herein, and

without any further action by the Parties:

   (a) each of the Burns and Roe Parties hereby fully, finally

and completely releases and waives any and all Claims against any of the Hartford

Released Parties with respect to the Subject Insurance Policies, including any and

all Claims for any premiums (whether retrospective or otherwise), deductibles, or

self-insured retentions, Direct Action Claims and Extra-Contractual Claims. This

release expressly includes: (i) matters at issue in the Adversary Proceeding, (ii) any

and all Insurance Coverage Claims, and (iii) all Claims attributable to the conduct

of litigation in the Adversary Proceeding and the Bankruptcy Case. Each of the

Burns and Roe Parties further hereby fully, finally and completely releases and

waives any and all Asbestos Insurance Coverage Claims, Direct Action Claims and

Extra-Contractual Claims based on acts or omissions prior to the Execution Date

against any of the Hartford Released Parties (including any and all claims for any

premiums, whether retrospective or otherwise, deductibles or self-insured

retentions) with respect to the Excepted Policies and any other third-party liability

policy that was issued by a Hartford Party to a Burns and Roe Party or that

provides insurance coverage and/or other benefits (excluding Workers'

Compensation Insurance) to a Burns and Roe Party for a policy period commencing

before May 1, 2004.

   (b) each of the Hartford Parties and The Hartford Financial

Services Group, Inc. hereby fully, finally and completely releases and waives any

and all Claims against any of the Burns and Roe Releasees with respect to the

Subject Insurance Policies, including any and all Claims for any premiums (whether

retrospective or otherwise), deductibles, or self-insured retentions, Direct Action

Claims and Extra-Contractual Claims.  This release expressly includes: (i) matters

at issue in the Adversary Proceeding, (ii) any and all Insurance Coverage Claims,

and (iii) all Claims attributable to the conduct of litigation in the Adversary

Proceeding and the Bankruptcy Case.  Each of the Hartford Parties and The

Hartford Financial Services Group, Inc. further hereby fully, finally and completely

release and waive any and all Asbestos Insurance Coverage Claims, Direct Action

Claims and Extra-Contractual Claims based on acts or omissions prior to the

Execution Date against any of the Burns and Roe Releasees (including any and all

claims for any premiums, whether retrospective or otherwise, deductibles or self-

insured retentions) with respect to the Excepted Policies and any other third-party

liability policy that was issued by a Hartford Party to a Burns and Roe Party or that

provides insurance coverage and/or other benefits (excluding Workers'
Compensation Insurance) to a Burns and Roe Party for a policy period commencing
before May 1, 2004.

4.2    The Parties expressly agree that (i) the 2004 Policies will not be
released, revised, limited or modified in any way by this Agreement, and the Parties
do not waive any rights they may have under the 2004 Policies, (ii) the Burns and
Roe Parties do not release or waive any Workers' Compensation Insurance,
(iii) except for Asbestos Insurance Coverage Claims, Direct Action Claims and
Extra-Contractual Claims based on acts or omissions prior to the Execution Date,
the Parties do not release or waive any Claims against one another under the
Excepted Policies or any other third-party liability policy (other than the Subject
Policies), including any and all Claims for any premiums (whether retrospective or
otherwise), deductibles, or self-insured retentions, and (iv) the Burns and Roe
Parties do not release any claim against any Person other than the Hartford
Released Parties.

4.3    The Burns and Roe Parties shall use their reasonable best
efforts to include in the Plan or attachments thereto provisions to the effect that
any Asbestos Plaintiff who accepts payment from the Trust shall be deemed to have
finally and completely released and waived any and all asbestos-related Claims,
including Trust Claims, against any of the Hartford Released Parties that are
attributable to the activities of the Burns and Roe Parties, the Subject Insurance
Policies or the Excepted Policies.

4.4.    The Parties agree that the Excepted Policies contain certain pollution exclusions and/or follow form to underlying policies that contain certain pollution exclusions.  The Parties further agree that no regulatory estoppel argument, or its substantial equivalent, affects the Hartford Parties' right or ability to assert those exclusions as a defense to any Claim.

4.5    The Parties recognize and understand that Claims that have been or may be asserted against the Burns and Roe Parties and/or the Trust may increase or decrease in amount or in severity over time, that Claims that have been or may be asserted against the Burns and Roe Parties and/or the Trust may include progressive, cumulative, unknown, and/or unforeseen elements, and that there may be hidden, unknown, and unknowable damages, defense expenses, or other costs related to such Claims.  Nevertheless, the Parties willingly enter into this Agreement, including the releases set forth in this Section IV.

4.6    The Parties acknowledge they have been advised by their respective legal counsel and are familiar with the provisions of Section 1542 of the California Civil Code, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of the executing of the release which if known by him or her must have materially affected his or her settlement with the debtor.

In furtherance of this Agreement, the Parties expressly waive any and all rights they may have under any contract, statute, code, regulation, ordinance, or the common law, which may limit or restrict the effect of a general release as to Claims,

23

including Insurance Coverage Claims, that they do not know or suspect to exist in their favor at the time of the execution of this Agreement.

4.7    Nothing in this Section IV is intended to, nor shall be construed to, release, waive or otherwise affect the Parties' rights and obligations under this Agreement.

4.8    Nothing in this Agreement shall constitute a release, waiver or assignment of any of the Hartford Released Parties' rights against its reinsurers, which rights are expressly retained by the Hartford Released Parties.

V.    DISMISSAL OF ADVERSARY PROCEEDING

5.1    Within three (3) business days of the filing of the motion seeking the Approval Order, the Parties shall stipulate to a dismissal without prejudice of all claims against one another in the Adversary Proceeding. Such dismissal will, without further action by any party, toll all time-related defenses, until such time as those claims are reinstated or the Adversary Proceeding is dismissed with prejudice, and no party will assert such time-related defenses in the Adversary Proceeding, and after the entry of the Approval Order as a Final Order, the Parties shall dismiss the claims in the Adversary Proceeding as between them with prejudice. Each Party is to bear its own fees and costs in the Adversary Proceeding.

VI.    REPRESENTATIONS AND WARRANTIES OF THE PARTIES

6.1    Each of the Parties separately represents and warrants (subject in the case of the Debtor to the entry of the Approval Order) as follows:

24

(a)    It has the requisite power and authority to enter into this Agreement and to perform the obligations imposed on it by this Agreement;

(b)    The execution and delivery of, and the performance of the obligations contemplated by, this Agreement have been approved by duly authorized representatives of the Party, and by all other necessary actions of the Party;

(c)    Each Party has expressly authorized its undersigned representative to execute this Agreement on the Party's behalf as its duly authorized agent;

(d)    This Agreement has been thoroughly negotiated and analyzed by its counsel and has been executed and delivered in good faith, pursuant to arm's length negotiations, and for value and valuable consideration;

(e)    Each Party has conducted a diligent, good faith search for any third-party liability policy that was issued by a Hartford Party to a Burns and Roe Party or that provides insurance coverage and/or other benefits to a Burns and Roe Party for a policy period commencing before May 1, 2004, and other than the Subject Insurance Policies listed on Exhibit 5, the Excepted Policies listed on Exhibit 3, Workers' Compensation Insurance, automobile liability insurance policies, and the 2004 Policies, neither Party is aware of any such insurance policy, secondary evidence of any such insurance policy or any reason to believe such an insurance policy exists. The search conducted by the Burns and Roe Parties consisted of a review of relevant archives for copies of general liability and wrap-up

insurance policies, and a review of available insurance schedules dating back to the early 1970s and information available on the Hartford Parties' website with respect to other types of insurance policies. The search conducted by the Hartford Parties consisted of searches of internal corporate databases in which extant historical policy information is maintained. The Parties agree that the searches described in the prior two sentences constitute "diligent, good faith searches."

(f)     Each Party represents and warrants that it is not aware of any Claim that has triggered or may trigger coverage under any Excepted Policy.

VII.    ENTIRE AGREEMENT

7.1    This Agreement constitutes a single integrated written contract that expresses the entire agreement and understanding between the Parties. Except as otherwise expressly provided, this Agreement supersedes all prior communications, settlements, and understandings between the Parties and their representatives regarding the matters addressed by this Agreement. Except as explicitly set forth in this Agreement, there are no representations, warranties, promises, or inducements, whether oral, written, expressed, or implied, that in any way affect or condition the validity of this Agreement or alter or supplement its terms. Any statements, promises, or inducements, whether made by any Party or any agents of any Party, that are not contained in this Agreement shall not be valid or binding.

## VIII.  NO ADMISSION OF LIABILITY/NO ENDORSEMENT OF PLAN

8.1    Except as necessary to enforce any undertakings set forth in this

Agreement, nothing contained in this Agreement is or shall be deemed to be (a) an

admission by any of the Hartford Parties that any Burns and Roe Party or the Trust

was or is entitled to any insurance coverage with respect to Asbestos Released

Claims or any other Claims or as to the validity of any of the coverage positions that

have been or could have been asserted by the Burns and Roe Parties and/or the

Trust; or (b) an admission by the Burns and Roe Parties as to the validity of any of

the coverage positions or defenses to coverage that have been or could have been

asserted by the Hartford Parties with respect to Asbestos Released Claims or any

other Claims.

8.2    By entering into this Agreement, the Parties have not waived

nor shall be deemed to have waived any right, obligation, privilege, defense or

position they may have asserted or might assert in connection with any Claim,

matter, Person or insurance policy outside the scope of this Agreement.  Except as

provided in Paragraph 3.5, no Person other than the Parties hereto shall have any

legally enforceable rights or benefits under this Agreement.

8.3    This Agreement represents a compromise of disputed Claims

and shall not be deemed an admission or concession by any Party of liability,

culpability, or wrongdoing.  The Hartford Parties' entry into this Agreement does

not constitute an endorsement of any plan of reorganization for Burns and Roe or a

statement of position of any kind as to whether any such plan of reorganization as proposed or confirmed is lawful or unlawful.

IX.    RIGHT OF REVIEW

9.1    The Hartford Parties shall have the right, at their own expense, upon reasonable notice, at a time and place convenient to the Trust, to review and/or audit the Trust and Trust payments. The Trust shall have no obligation to create any new documents or to collect any information in connection with any such review beyond those ordinarily created or maintained by the Trust, and the Hartford Parties shall not be permitted to challenge the allowance or payment of the Claims by the Trust or any administrative payments or costs of the Trust. This Section IX, and any results of such a review, shall not affect the Hartford Parties' payment obligations under this Agreement. The Hartford Parties shall not provide any results of such review to any other Person and shall keep any and all such results confidential, except that the Hartford Parties may provide such results to any of their auditors, regulators, or reinsurers for the purpose of obtaining reinsurance for any portion of the Settlement Amount, or complying with applicable regulations, provided that the Hartford Parties shall inform such parties that the audit results are confidential and use reasonable efforts to obtain a commitment from such parties to maintain the confidentiality of the information. The Hartford Parties may provide such information to any others with the prior written consent of the Trust, which consent shall not be unreasonably withheld.

28

9.2    Nothing in the Agreement shall affect the Hartford Parties' rights, if any, to audit at the Hartford Parties' sole expense any Burns and Roe Party with respect to insurance policies other than the Subject Insurance Policies.

X.    COOPERATION

10.1   Each Party agrees to take such steps and to execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Agreement and to preserve its validity and enforceability.  In the event that any action or proceeding of any type whatsoever is commenced or prosecuted by any Person not a Party hereto to invalidate, interpret, or prevent the validation, enforcement, or carrying out of all or any of the provisions of this Agreement, the Parties mutually agree, represent, warrant, and covenant to cooperate fully in opposing such action or proceeding.

XI.    CONSTRUCTION

11.1   This Agreement was negotiated among the Parties hereto at arm's length and in good faith, with each Party receiving advice from independent legal counsel. It is the intent of the Parties that no part of this Agreement be construed against any of the Parties hereto because of the identity of the drafter or the fact that the Hartford Parties are insurance companies. It is agreed among the Parties hereto that this is not an insurance contract and that no special rules of construction apply to this Agreement, including the doctrine of contra proferentem.

29

## XII.   NOTICE

12.1   All notices, demands, payments, accountings or other

communications that any Party desires or is required to give shall be given in

writing and shall be deemed to have been given if hand delivered, faxed, or if mailed

by United States first-class mail, postage prepaid, to the Parties at the addresses

noted below, or such other address as any Party may designate in writing from time

to time:

As to the Burns and Roe Parties:

Charles Doyle, Esq.
Burns and Roe Enterprises, Inc.
800 Kinderkamack Road
Oradell, New Jersey  07649

With a copy to:

Jack M. Zackin, Esq.
Sills Cummis Epstein & Gross, P.A.
One Riverfront Plaza
Newark, New Jersey  07102

 -and-

Donald W. Kiel, Esq.
Kirkpatrick & Lockhart LLP
One Newark Center
10th Floor
Newark, New Jersey  07102

As to the Hartford Parties:

Andrew J. Pinkes
Senior Vice President
Complex Claim Group
The Hartford
Hartford Plaza
Hartford, CT  06115

With a copy to:

James P. Ruggeri, Esq.
Hogan & Hartson L.L.P.
555 Thirteenth Street, N.W.
Washington, DC 20004

 -and-

Duane D. Morse, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
1600 Tysons Blvd., 10th Floor
McLean, VA 22102

Notice shall be provided to the Trust at such address designated by Burns and Roe

or as the Bankruptcy Trust may designate in writing.

## XIII.  HEADINGS

13.1    Titles and captions contained in the Agreement are inserted

only as a matter of convenience and are for reference purposes only.  Such titles and

captions in no way are intended to define, limit, expand or describe the scope of this

Agreement, nor the intent of any provision thereof.

## XIV.  EXECUTION AND DELIVERY

14.1    This Agreement may be executed in counterpart originals, all of

which, when so executed and taken together, shall be deemed an original and all of

which shall constitute one and the same instrument.  Each counterpart may be

delivered by facsimile, and a faxed signature shall have the same force and effect as

an original signature.

31

## XV.   DISPUTE RESOLUTION

15.1   The Parties agree that before resorting to litigation they will attempt to resolve informally any disputes arising under this Agreement through good faith negotiations for a period of sixty (60) days after written notification regarding such dispute.

15.2   The Parties agree to submit all disputes relating to this Agreement to the jurisdiction of the Bankruptcy Court. If the Bankruptcy Court refuses to exercise jurisdiction over any such dispute, the Parties may submit such dispute to any court of competent jurisdiction.

## XVI.   ASSIGNMENT

16.1   Except as expressly provided by this Agreement or by the Plan, this Agreement shall not be assignable by any Party hereto without the prior written consent of (i) the other Parties, (ii) the Committee and the Futures Representative to the extent each exists, and (iii) the Bankruptcy Trust if it exists, which consent shall not be unreasonably withheld.

## XVII.   AMENDMENT

17.1   This Agreement may not be amended, altered or modified except by a written agreement duly executed by each Party (or its successors or assigns) and with the consent of the Committee, the Futures Representative, and the Trust, so long as such entities exist.

32

XVIII.  <u>NO WAIVER</u>

18.1   Neither the waiver by a Party hereto of a breach of or a default under any of the provisions of this Agreement, nor the failure of a Party, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any such provisions, rights, or privileges hereunder.

XIX.  <u>AGREEMENT INADMISSIBLE</u>

19.1   Settlement negotiations leading up to this Agreement and all related discussions and negotiations shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions.  Except as necessary with respect to the motion seeking the Approval Order, any evidence of the terms of this Agreement or negotiations or discussions associated with this Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, except in (i) an action or proceeding to enforce the terms of this Agreement, (ii) any possible action or proceeding between the Hartford Parties and any of their reinsurers, (iii) as otherwise directed by any court of competent jurisdiction, or (iv) as otherwise provided herein.  This Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Parties' obligations under any insurance policy.

XX. CONDITION PRECEDENT

20.1 It is a condition precedent to the effectiveness of this Agreement that the Committee and the Futures Representative consent in writing to the Burns and Roe Parties' entry into this Agreement, and this Agreement is subject to such consent.

20.2 Such consent by the Committee and the Futures Representative shall be made solely in their capacities as such.

IN WITNESS WHEREOF, the Parties, by their duly authorized representatives, have caused this Agreement to be duly executed as of the date set forth with the respective signatures below:

34

**FOR THE BURNS AND ROE PARTIES (conditioned
upon the entry of the Approval Order)
(as defined in Paragraph I.L.)**


By: _____

Name:  Charles A. Doyle

Title:  Vice President and General Counsel

Date:  December 1, 2004


35

**FOR THE HARTFORD PARTIES (conditioned upon the entry of the Approval Order) (as defined in Paragraph I.W.)**

By: _____

Name: _Andrew J. Pinkes_____

Title: _Senior Vice President_____

Date: _Dec 2, 2004_____

36

In accordance with Paragraph 20.1 of the Agreement, the following Persons consent to the Burns and Roe Parties' entry into the Agreement, including all attachments hereto:

**FOR THE FUTURES REPRESENTATIVE (as defined in Paragraph I.V.)**

By: _Anthony R. Calascibetta_

Name: _Anthony R. Calascibetta_

Title: _Legal Representative of Future Asbestos Personal Injury Claimant_

Date: _December 1, 2004_

37

**FOR THE COMMITTEE (as defined in Paragraph I.O.)**

By: _Peter Van N. Lockwood_

Name: _Peter Van N. Lockwood_

Title: _Counsel to the Committee_

Date: _12/1/04_

## EXHIBIT B

to the

## STIPULATED ORDER

## Investment Criteria for the Qualified Fund

Investment of monies held in the Qualified Fund shall be administered in the manner in which individuals of ordinary prudence, discretion, and judgment would act in the management of their own affairs, subject to the following limitations and provisions:

(a)     The Qualified Fund shall not acquire, directly or indirectly, equity in any entity or business enterprise if, immediately following such acquisition, the Qualified Fund would hold more than 5% of the equity in such entity or business enterprise.  The Qualified Fund shall not hold, directly or indirectly, more than 10% of the equity in any entity or business enterprise.

(b)     The Qualified Fund shall not acquire or hold any long-term debt securities unless (i) such securities are rated "Baa" or higher by Moody's, "BBB" or higher by Standard & Poor's ("*S&P's*"), or have been given an equivalent investment grade rating by another nationally recognized statistical rating agency, or (iii) have been issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.

(c)     The Qualified Fund shall not acquire or hold for longer than ninety (90) days any commercial paper unless such commercial paper is rated "Prime-1" or higher by Moody's or "A-1" or higher by S&P's or has been given an equivalent rating by another nationally recognized statistical rating agency.

(d)     The Qualified Fund shall not acquire or hold any common or preferred stock or convertible securities unless such stock or securities are rated "A" or higher by Moody's or "A" or higher by S&P's or have been given an equivalent investment grade rating by another nationally recognized statistical rating agency.

(e)     The Qualified Fund shall not acquire any debt securities or other instruments issued by any entity (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof) if, following such acquisition, the aggregate market value of all debt securities and instruments issued by such entity held by the Qualified Fund would exceed 2% of the aggregate value of the assets held by the Qualified Fund.  The Qualified Fund shall not hold any debt securities or other instruments issued by any entity (other than debt securities or other instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof) to the extent that the aggregate market value of all securities and instruments issued by such entity held by the Qualified Fund would exceed 5% of the aggregate value of the assets held by the Qualified Fund.

(f)     The Qualified Fund shall not acquire or hold any certificates of deposit unless all publicly held, long-term debt securities, if any, of the financial institution issuing the certificate of deposit and the holding company, if any, of which such financial institution is a subsidiary, meet the standards set forth in Section (b) above.

#873827 v3

     (g)     The Qualified Fund shall not acquire or hold any repurchase obligations unless, in the opinion of the Trustees, they are adequately collateralized.

     (h)     The Qualified Fund shall not acquire or hold any options or warrants.